# UNITED STATES DISTRICT COURT

for the

Eastern District of California

<table>
<tr><td>In the Matter of the Search of<br><br>1501 West Capitol Avenue, #105, West Sacramento, CA; 1501 West Capitol Avenue, #106, West Sacramento, CA; 1501 West Capitol Avenue, #107, West Sacramento, CA</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.    2:25-sw-0728 AC</td></tr>
</table>

FILED
Aug 28, 2025
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl and Methamphetamine |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/ William Silvermaster_____
*Applicant's signature*

William Silvermaster, FBI TFO
*Printed name and title*

Sworn to me telephonically.

Date: August 28, 2025

City and state:  Sacramento, California

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

ERIC GRANT
United States Attorney
J. DOUGLAS HARMAN
Assistant United States Attorney
MATTHEW DE MOURA
Special Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

### IN THE UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of:<br><br>1501 West Capitol Avenue, #105, West Sacramento, CA; 1501 West Capitol Avenue, #106, West Sacramento, CA; 1501 West Capitol Avenue, #107, West Sacramento, CA | CASE NO.<br><br>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT<br><br>**UNDER SEAL** |

I, William Silvermaster, being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for a warrant to search the following premises: 1501 West Capitol Avenue, #105, West Sacramento, California, 1501 West Capitol Avenue, #106, West Sacramento, California, 1501 West Capitol Avenue, #107, West Sacramento, California, hereinafter collectively referred to as "**Premises**," as further described in Attachments A-1 through A-3 for the items and information further described in Attachment B.

2.      I have been a sworn peace officer since January 2017 and am currently a Detective with the Special Investigations Unit as part of the West Sacramento Police Department. I am currently assigned as a Task Force Officer assigned to the FBI's Safe Streets Task Force and have been since June of 2021. I have been sworn and duly charged with the duties of investigating violations of the drug and

1  criminal laws of the United States as stated in Title 21 U.S.C. § 878 by the Attorney General of the

2  United States.

3       3.      During the course of my law enforcement career, I have participated in numerous

4  criminal investigations.  I have also participated in numerous investigations involving the use of federal

5  and state search warrants to collect evidence, including controlled substances, the seizure of drug-related

6  records, and other types of evidence that document the activities of criminal organizations in both the

7  manufacturing and distribution of controlled substances and weapons.  To successfully conduct these

8  investigations, I have utilized a variety of investigative techniques and resources such as physical and

9  electronic surveillance, various types of infiltration (including undercover agents, informants, and

10 cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash

11 covers, mail covers, pole cameras, stationary video recording vehicles, cell site simulators, and audio

12 and audio/video recording devices.  Through these investigations, my training and experience, and

13 conversations with other agents, detectives, and law enforcement personnel, I have become familiar with

14 the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to

15 smuggle and safeguard controlled substances; to distribute, manufacture, and transport controlled

16 substances; and to collect and launder related proceeds.

17      4.      Based on the facts set forth below, I believe that James L. KENNEY (YOB: 1980) and

18 Kevin Lamont LEACY (YOB: 1994) knowingly and intentionally conspired to distribute and possessed

19 with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1), beginning

20 on a date unknown but no later than in or about May 2025 and continuing to the present.  This Affidavit

21 therefore requests authority to search the locations described in Attachments A-1 through A-3 in order to

22 locate and seize the items described in Attachment B as evidence and instrumentalities of crime,

23 specifically, violations of 21 U.S.C. § 846 and 841(a)(1).

24      5.      This affidavit is intended to show only that there is sufficient probable cause for the

25 requested warrant and does not set forth all of my knowledge about this matter.

26

27

28

AFFIDAVIT                                          2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    PROBABLE CAUSE

### A.    FBI Controlled Fentanyl Purchase from KENNEY

6.    On May 2, 2025, an FBI Confidential Human Source[1] (hereinafter "CHS-1") met KENNEY during one of KENNEY's scheduled Yolo County Probation appointment.  CHS-1 did so at the direction of law enforcement and the meeting was audio recorded.  CHS-1 engaged in a conversation with KENNEY for the purpose of establishing a relationship with KENNEY that would allow CHS-1 to obtain information about criminal activity.  During the conversation, CHS-1 and KENNEY discussed drug sales.  KENNEY identified himself as "P Mike" and provided CHS-1 with phone number (279) 265-0069 for further communication.

7.    Later, still on the same day, CHS-1 conducted a controlled fentanyl purchase from KENNEY, purchasing approximately two ounces of suspected fentanyl for $1,900.  CHS-1 arranged to meet with KENNEY to purchase marijuana then transitioned the conversation to other drugs.  CHS-1 arranged the meeting by exchanging text messages with KENNEY at the number (279) 265-0069 which KENNY had provided to CHS-1.  CHS-1 asked KENNY about coming to purchase marijuana. KENNEY responded that "Redmob" could help and gave phone number (530) 980-4281.  CHS-1 replied that he/she would rather deal directly with KENNEY and conducted a recorded phone call to KENNEY on KENNEY's number.  KENNEY agreed to let CHS-1 know when he was back in the area. Later, KENNEY sent a text message saying "I'm bakc" from KENNEY's number and asked CHS-1 to come to the Dude Motel.  KENNEY also provided the address in a text message: "1501 west capitol ave West Sacramento," which is located in the Eastern District of California

8.    Prior to the operation, CHS-1 met with law enforcement at a pre-determined staging location.  Law enforcement briefed CHS-1 regarding the objectives of the operation and safety

---

[1] CHS-1 is cooperating with law enforcement in exchange for monetary compensation.  CHS-1 has been an informant for the FBI since 2013 and has provided reliable information that has been independently verified by Special Agents and Task Force Officers.  CHS-1 has been convicted of the following offenses: Burglary, Grand Theft-Auto, Assault with a Deadly Weapon (not a firearm), Assault with a Deadly Weapon on Officer (Not a Firearm), Voluntary Manslaughter, and Participating in a Criminal Street Gang.  CHS-1 was arrested for identity theft and forgery in 2006 but was not convicted of these crimes.  CHS-1 was arrested for shoplifting in 2024.  CHS-1 does not have any criminal history or convictions for perjury.  CHS-1 has conducted numerous controlled buys of firearms and narcotics in multiple federal investigations.  CHS-1 has testified in federal court in 2022 and provided accurate and truthful testimony for an FBI investigation CHS-1 participated in.

considerations, and searched CHS-1's person and vehicle for weapons and/or contraband with negative results. Law enforcement provided CHS-1 with $2,400 in recorded buy funds, audio and video recording devices, and a transmitter. CHS-1 departed the staging location and drove directly, under law enforcement surveillance, to the buy location.

9. At the buy location, KENNEY was standing next to a white Nissan sedan. CHS-1 approached and asked KENNEY about cocaine and KENNEY responded that he had "fetty, black, and powder." CHS-1 asked to purchase two ounces of "fetty." A few moments later, KENNEY asked CHS-1 if he/she wanted some "clear too."

10. Based on training and experience, I know that "fetty" is a slang term for fentanyl, "black" is a slang term for heroin, "powder" is a slang term for cocaine, and "clear" is a slang term for methamphetamine. I believe KENNEY was stating that he possessed all of these controlled substances and was offering to sell CHS-1 any of them during this interaction.

11. Referring to the fentanyl, KENNEY told CHS-1 that he could get the drugs "all day long" and that if CHS-1 wanted "80 of them, it's good." CHS-1 and KENNEY then entered one of the motel rooms. Inside the room, CHS-1 gave KENNEY $2,000 in buy funds and KENNEY gave CHS-1 two bags of suspected fentanyl and returned $100. KENNEY also introduced CHS-1 to "Redmob."

12. CHS-1 departed the buy location and drove, under law enforcement surveillance, directly to another staging location. Law enforcement seized the plastic bags containing suspected fentanyl, recovered the audio/video recording devices, remaining buy funds, and transmitter, then searched CHS-1 and his/her vehicle for weapons and/or contraband with negative results. CHS-1 identified KENNEY based on a Sacramento County booking photo. CHS-1 identified "Redmob" as Kevin LEACY based on another Sacramento County booking photo, and CHS-1 noted that LEACY no longer had the dread locks observed in the booking photo. CHS-1 also stated that "Redmob" brought the two bags containing suspected fentanyl to KENNEY. The FBI submitted the bags of suspected fentanyl to the DEA Western Laboratory, and the results showed that they contained fentanyl.

**B.    FBI Controlled Fentanyl and Methamphetamine Purchase from KENNEY and LEACY**

13. On May 13, 2025, at the direction of law enforcement, CHS-1 conducted another

controlled purchase from KENNEY and LEACY, this time purchasing approximately two more ounces of suspected fentanyl and four ounces of methamphetamine for $2,600.  Prior to the operation, CHS-1 met with law enforcement at a pre-determined staging location.  CHS-1 conducted a recorded phone call to KENNEY's number.  In summary, KENNEY responded that he was headed to the south area to meet someone and that he would be back in 30 minutes.  KENNEY told CHS-1 to head to the "spot" and that his "brother" would be there and could call KENNEY on FaceTime because it is the only thing that cannot be intercepted.  KENNEY said that he introduced CHS-1 to his brother last time.  Based on the previous controlled purchase operation on May 2, CHS-1 understood the "spot" to refer to the Dude Motel located at 1501 West Capitol Avenue, West Sacramento, California, hereinafter the "buy location."

14.     Law enforcement briefed CHS-1 regarding the objectives of the operation and safety considerations, and searched CHS-1's person and vehicle for weapons and/or contraband with negative results.  Law enforcement provided CHS-1 with $4,000 in recorded buy funds, audio and video recording devices, and a transmitter.  CHS-1 again called KENNEY on KENNEY's number and KENNEY said he was still not back.

15.     At approximately 3:18 p.m., KENNEY returned to the buy location wearing a blue backpack and light blue shoes.  CHS-1 departed the staging location and drove directly, under law enforcement surveillance, to the buy location.  At the buy location, CHS-1 met KENNEY, LEACY, and unidentified male near room 109.  CHS-1 and KENNEY stepped away.  Below is a transcription of a portion of their conversation:

CHS-1:  "You got, you got clear? Yeah? Uhh what you p's goin for?"

KENNEY: "Haven't got no (unintelligible), I'm just I'm just really starting back selling clear again.  I can get you a p probably for like uh 11, a band somethin like that. (unintelligible) call my nigga for you."

CHS-1:  "Do it right now?"

KENNEY: "Yeah I'll call him right now see what's up."

CHS-1:  "Let's do it.  I need uh I need a hammer too."

KENNEY: "I can get those too.  They be costin like a band and shit."

CHS-1:  "(unintelligible) A nine?"

KENNEY: "Um I don't really got no nines, I, here let me call my nigga, I got I got some shit but I you know I really don't be selling slabs, but I can get you something for sure."

16.    I know, based on training and experience that "clear" is a slang term for methamphetamine, "p" is slang for a pound, "band" is a slang term for $1,000, and "hammer" and "slab" are both slang terms for firearms.  I believe KENNEY was telling CHS-1 that he was able to get a pound of methamphetamine for CHS-1, but did not have that quantity immediately available because he was resuming methamphetamine distribution after a hiatus.  I believe KENNEY was also telling CHS-1 that he could obtain firearms although he did not sell them often.  I also believe KENNEY was claiming to possess firearms when he said, "I got some shit."

17.    KENNEY, using his phone, made a phone call on speaker that went unanswered.  KENNEY immediately made another call which was answered by a male.  Toll records showed that KENNEY made the call to telephone number (916) 832-7333.  Law enforcement later identified the user of (916) 832-7333 as a specific individual with the initials C.M., as explained below.  Below is a transcription of KENNEY's conversation with C.M.:

C.M.:    "Hello"

KENNEY: "Hey what's up with your"

C.M.:    "Hey I'm just waitin for him I'm just waitin for him to call me (unintelligible)."

KENNEY: "That's not what I'm talkin about, I'm talkin about what's up with your boy with the clear.  My nigga tryna, my nigga tryna get a p right now."

C.M.:    "I can call."

KENNEY: "Call him right now and call me right back.  Call right now call me right back."

C.M.:    "All right."

18.    CHS-1 then asked KENNEY for more fentanyl.  KENNEY asked CHS-1 how many he/she wanted and CHS-1 answered "one," referring to one ounce.  KENNEY answered, "it's all good" and CHS-1 went to wait in his/her vehicle.  KENNEY stopped in a west facing room of the motel, then walked to room 109.  A few moments later, KENNEY and LEACY approached CHS-1's vehicle and KENNEY said something unintelligible, then walked into room 109.  LEACY handed CHS-1 a plastic

bag containing suspected fentanyl. CHS-1 counted out $1,000 in recorded buy funds and handed it to LEACY and told LEACY that he/she was waiting for something else from KENNEY. LEACY walked into room 109 briefly, then returned and told CHS-1 that KENNEY was just waiting on a call. CHS-1 said that he/she wanted another ounce of fentanyl. LEACY went back into room 109.

19.    After a few moments, CHS-1 walked into room 109. CHS-1 then exchanged another $1,000 in recorded buy funds for another bag of suspected fentanyl with LEACY. CHS-1 also asked KENNEY how much "clear" he had, and KENNEY answered, "like 14, 13 zips, or something like that." I know, based on training and experience, that a "zip" is a slang term for an ounce. KENNEY agreed to sell some methamphetamine for $150 per ounce. CHS-1 asked for four ounces of methamphetamine and KENNEY agreed, saying "it's all good."

20.    CHS-1 returned to his/her vehicle to wait for the methamphetamine, then went back inside room 109. CHS-1 counted out the recorded buy funds and asked LEACY what the price was. LEACY answered "six" and CHS-1 gave LEACY $600 in buy funds and LEACY provided the methamphetamine in a plastic bag. CHS-1 departed the buy location and drove, under law enforcement surveillance, directly to a staging location. Law enforcement seized the plastic bags containing suspected fentanyl and methamphetamine, recovered the audio/video recording devices, remaining buy funds, and transmitter, then searched CHS-1 and his/her vehicle for weapons and/or contraband with negative results. CHS-1 identified KENNEY and LEACY based on Sacramento County booking photos contained in the FBI operation plan. CHS stated LEACY no longer has dreadlocks but still recognized the subject as LEACY aka "Redmob." The suspected methamphetamine was field tested, and the result was a presumptive positive. The FBI submitted the suspected fentanyl and methamphetamine to the DEA Western Laboratory, and the test results showed that the suspected fentanyl did contain fentanyl and the suspected methamphetamine did contain methamphetamine.

**C.    FBI Controlled Methamphetamine Purchase from KENNEY**

21.    On May 19, 2025, at the direction of law enforcement, CHS-1 made a recorded phone call to KENNEY's phone to arrange another controlled purchase. CHS-1 and KENNEY both made indirect references to the methamphetamine CHS-1 purchased from KENNEY and LEACY on May 13 and to the firearms he/she attempted to purchase. KENNEY affirmed that he would be able to get what

CHS-1 asked for.  CHS-1 understood KENNEY to be referring to the previous controlled purchase operation on May 13, 2025 during which CHS-1 asked to purchase a pound of methamphetamine and a firearm.

22.    On May 23 at 12:15 p.m., CHS-1 called KENNEY via (279) 265-0069 to confirm the deal.  KENNEY confirmed and claimed he spoke to his source of supply the night before.  The call was recorded.  I reviewed toll records after the operation which showed that, at 12:16 p.m., KENENY made multiple outgoing calls to (916) 832-7333.  There were also multiple calls between the KENNEY's phone and (916) 832-7333 on the night of May 22.  In my training and experience, based on the timing and frequency of the calls, I believe 916-832-7333 is the phone number belonging to KENNEY's source of supply.

23.    Prior to the operation, CHS-1 met with law enforcement at a pre-determined staging location.  Law enforcement briefed CHS-1 regarding the objectives of the operation and safety considerations, and searched CHS-1's person and vehicle for weapons and/or contraband with negative results.  Law enforcement provided CHS-1 with $4,400 in recorded buy funds, audio and video recording devices, and a transmitter.

24.    CHS-1 departed the staging area and drove, under law enforcement surveillance, directly to the Dude Motel at 1501 West Capitol Avenue, West Sacramento, arriving at approximately 1:43 p.m.  Upon arriving, CHS-1 called KENNEY via KENNEY's phone number.  KENNEY came outside and met CHS-1 outside his/her vehicle.  CHS-1 asked KENNEY about firearms, then they separated.  At approximately 1:46 p.m., KENNEY returned to CHS-1's vehicle.  A recording device captured a third voice, distinct from CHS-1 and KENNEY, which said, in part, "he's on his way back from Stockton right now."

25.    Toll records showed that 1:46 p.m., the same time as the recording capture of the third voice with KENNEY and CHS-1, KENNEY received an incoming call from (916) 832-7333.  The incoming call lasted approximately one minute and 16 seconds.  I believe this call was partially captured by a recording device and is the source of the third voice mentioned above.  Tolls also showed that KENNEY called that same phone number during the May 13 controlled purchase operation and the conversation was audible on recording devices, as explained above.  Based on listening to both recorded

1   phone calls with (916) 832-7333, I believe the same voice is speaking on that line.

2       26.     According to toll records, the subscriber for 916-832-7333 is "D. E." and the address

3   associated with the subscriber account is 640 Cummins Way Apt A, West Sacramento.  I listened to a

4   Sacramento County Jail call made by an inmate to 916-832-7333 recorded on April 20, 2025 and

5   unrelated to this case.  At the beginning of the call, the inmate said, "Hey, Reid" and the called party

6   answered, "yeah." According to California Department of Motor Vehicle records, C.M. also lives at 640

7   Cummins Way Apt A, West Sacramento.  I know, based on training and experience, that drug traffickers

8   often use phones associated with other names than their own in an attempt to conceal their identities

9   from law enforcement.  I believe C.M. is the user of 916-832-7333.

10      27.     After the phone call with C.M., KENNEY and CHS-1 had a brief discussion regarding

11  firearms.  Much of the conversation was muffled and unintelligible because of a power failure in a

12  recording device.

13      28.     Toll records showed that, at 1:51 p.m., C.M.'s (916) 832-7333 number made an outgoing

14  call to KENNEY's phone.  At 1:52 p.m., law enforcement surveillance observed KENNEY depart the

15  motel in a black Nissan sedan bearing Nevada license plate 5134C0, while CHS-1 waited at the motel.

16  KENNEY drove to 640 Cummins Way, West Sacramento, where a male entered the vehicle at 1:59 p.m.

17  At 2:02 p.m., the unidentified male exited KENNEY's black Nissan and entered a white Honda Accord

18  bearing California license plate 5NTC637 and departed from 640 Cummins Way.  At 2:03 p.m.,

19  KENNEY departed, still driving the black Nissan.  Law enforcement did not continue to follow

20  KENNEY.  Based on my training and experience, I believe that KENNEY left the motel at 1:52 p.m.  to

21  meet with C.M. on Cummins Way to make a payment for methamphetamine, and that C.M. left to pick

22  it up from another party.  At 2:19 p.m., KENNEY returned to the buy location at the motel and told

23  CHS-1, "he just went to grab it, he'll be back in like 15 minutes."  I believe KENNEY was informing

24  CHS-1 that his supplier (C.M.) was going to get the methamphetamines that CHS-1 requested.  CHS-1

25  then asked indirectly about a firearm and KENNEY said, "I'm about to call right now."  CHS-1 asked

26  KENNEY to try to get two firearms and he responded, "all right, fo sure."

27      29.     At 2:35 p.m., KENNEY returned to CHS-1's vehicle and said, "he said as soon as he gets

28  back to the house, I could pull up to him and talk to him." CHS-1 asked if that would take another hour

and KENNEY responded, "an hour or so on the slabs, the clear should be pulling up any second." I know, based on training and experience, that "slabs" is a slang term for firearms and "clear" is a slang term for methamphetamine.

30.    After the conversation, CHS-1 departed the motel and drove, under law enforcement surveillance, to a staging location. Law enforcement deactivated the recording devices and transmitter. CHS-1 remained with law enforcement until departing the staging area at 3:16 p.m., after law enforcement reactivated recording devices and the transmitter. At 3:17 p.m., law enforcement saw KENNEY, LEACY, and an unidentified white male in a pink shirt depart the motel in the black Nissan sedan. CHS-1 drove, under law enforcement surveillance to the buy location.

31.    At 3:31 p.m., the black Nissan sedan returned to the buy location. LEACY, in a blue shirt entered CHS-1's vehicle and handed CHS-1 a graham cracker box containing a bag of methamphetamine. CHS-1 counted out $1,100 in recorded buy funds and handed it to LEACY, who counted it. LEACY then exited CHS-1's vehicle.

32.    KENNEY approached CHS-1's vehicle and said that his gun supplier was slow and that he could sell the firearms to CHS-1 on another day. He said he last contacted the supplier approximately twenty minutes earlier. KENNEY explained that the supplier had money and was not in a rush.

33.    CHS-1 departed the motel and drove, under law enforcement surveillance, to the staging location. Law enforcement seized the methamphetamine in a plastic bag, recovered the audio/video recording devices, remaining buy funds, and transmitter, then searched CHS-1 and his/her vehicle for weapons and/or contraband with negative results. CHS-1 identified KENNEY and Leacy based on Sacramento County booking photos contained in the FBI operation plan. The methamphetamine was later field-tested yielding a presumptive positive result. The FBI submitted the suspected methamphetamine to the DEA Western Laboratory for chemical analysis, the results of which were positive for methamphetamine.

        D.    **FBI Surveillance Vehicle Observations:**

34.    On August 26, 2025, an FBI surveillance vehicle equipped with a recording camera was legally parked across the street from The Dude Motel, 1501 West Capitol Avenue, West Sacramento,

California.  The surveillance vehicle captured footage of multiple rooms in The Dude Motel, including Rooms #105, #106, and #107 from August 26 through August 27.

### 2.    Room #105 Observations:

35.    FBI Special Agent Greg Richardson reviewed the footage from the FBI surveillance vehicle and observed Kevin LEACY entering and exiting room #105 without restriction on several occasions between August 26 and August 27, 2025.  LEACY did not appear to need or use a key or card to access the motel room.

### 3.    Room #106 Observations:

36.    FBI Special Agent Greg Richardson reviewed the footage from the FBI surveillance vehicle and observed that James KENNEY entered and exited room #106 without restriction on several occasions, including at 12:57am on August 27, 2025.  KENNEY did not appear to need or use a key or card to access the motel room.

### 4.    Room #107 Observations:

37.    FBI Special Agent Greg Richardson reviewed the footage from the FBI surveillance vehicle and observed that James KENNEY enter room #107 at approximately 12:27am and exit at approximately 12:57am on August 27, 2025.  After exiting room #107, KENNEY then returned room 106.  Later that day, at approximately 11:30am, Detective Seth Killion from the West Sacramento Police Department observed an individual with initials A.A. exit room #107.  Task Force Officer Silvermaster has also had contact with A.A. during previous investigations into KENNEY.  A.A. is KENNEY's known significant other.

38.    Previously, on August 20, 2025, there was a call for service at The Dude Motel, and during that call for service, A.A. was contacted by Detective Nate Ogden of the West Sacramento Police Department.  A.A. stated to Detective Ogden, on body worn camera, that she/he lived in room #107.

39.    Based on these prior contacts with A.A., observations from August 27, and A.A.'s known association with KENNY, Room #107 is believed to be occupied and rented by A.A.  Based on A.A.'s association with KENNEY, and KENNEY entering her/his room at 12:57am on August 27, 2025, I believe evidence will be located within the premises.

### E.    Training and Experience Concerning Drug Traffickers

40.    As a result of my experience and training, I have learned that traffickers often continue a cycle of maintaining narcotics, selling their narcotics, obtaining more narcotics to sell, as well as firearms and firearms parts, including ammunition, magazines and other forms of firearms indicia.

41.    From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons (including firearms), ammunition, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms including those belonging to other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized. This warrant therefore seeks permission to search the entire premises of each residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.

42.    Based on my training and experience, I know that drug distributors commonly have in their possession (that is, on their person, at their residence, and in areas under their control), firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers, and other weapons. Such firearms are used to protect and secure drug distributors, their contraband, and property derived from drug distribution proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers, and quantities of currency related to their drug distributing activity.

43.    Based on my training and experience, I know that drug distributors and large scale traffickers maintain in their possession, at their residences, and at areas under their control fictitious identification, including, but not limited to, driver's licenses, employment cards, insurance cards, social security cards, naturalization records, certificates of birth, and passports which are obtained by the distributors or traffickers and used in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activity.

44.    Based on my training and experience, I know that drug distributors and traffickers often utilize vehicles to transport and distribute controlled substances and/or analogues to facilitate their

AFFIDAVIT                                      12

distributing and trafficking activities.  Based on my training, background, experience, conversations with other law enforcement officers, and the knowledge I have gained through this investigation, I also know that distributors and traffickers will also utilize vehicles as locations in which to store controlled substances and/or analogues prior to distribution.  Individuals who manufacture and/or distribute controlled substances and/or analogues commonly maintain books, records, receipts, notes, ledgers, and other papers relating to the expenses and procurement of material and equipment used to obtain controlled substances and/or analogues or to manufacture, transport, order, sell, or distribute them, even though such documents may be in code.  These books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug distributors have ready access to them, i.e., homes, offices, automobiles, and businesses.  During prior investigations, I have observed that drug distributors and traffickers will often use vehicles registered in the names of individuals other than themselves to avoid detection by law enforcement.

45.    Based on my training and experience, I know that articles of personal property, such as personal identification, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, rent receipts, addressed envelopes, bills, keys, personal telephone and address books, unexposed film, video tapes, and video cassette boxes, are essential to establish the identities of individuals in control or possession of the premises, residences, vehicles, storage areas, and containers being searched.

46.    Based on my training and experience, I know that individuals involved in the possession, manufacture and/or distribution of controlled substances or conspiracy to commit those offenses often use cellular telephones to further their criminal activity and maintain telephone bills which reflect their calls which facilitate the distribution of controlled substances and/or analogues.  By answering telephones and returning calls, co-conspirators have been identified, and additional controlled substances and/or analogues have been seized.

47.    Based on my training and experience, I know that individuals who manufacture and/or distribute controlled substances often travel, sometimes great distances, in order to acquire controlled substances and/or analogues or materials and equipment to manufacture controlled substances and/or analogues.  Records of their travels are often found at their businesses and at their residences.  Further,

AFFIDAVIT                                    13

drug distributors sometimes maintain communications, records, information, property and/or documentation relating to their drug activity. The terms "communication," "records," "information," or "property" includes all of the foregoing items of evidence in whatever form and by whatever means that may have been created or stored, including records, whether stored on paper or on memory storage devices such as thumb drives, flash drives, and hard drives, programmable instruments such as telephones, "electronic address books," calculators, or any other storage media, or any other form of "writing", together with indicia of use, ownership, possession, or control of such "records," "information," and "property."

48.    Based on my training and experience, I know that the types of evidence enumerated in Attachment B, attached hereto and incorporated herein by reference, have often been recovered at the residence or place of business of drug distributors and, in addition, from other structures and areas on the property being searched, as for example, other storage lockers/areas, detached closets, and containers.

49.    Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those people are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. In my training and experience, I have found that traffickers keep records of those registrations and transactions in their residences.

50.    I have learned that large-scale drug traffickers often have on hand large amounts of U.S. currency to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

51.     In my experience, drug traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to, handguns, pistols, revolvers, rifles, shotguns, and other weapons.  Such firearms are used by drug traffickers to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug traffickers because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.  Such property may include, but is not limited to, drugs and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers, and quantities of currency.  Further, I am aware that drug traffickers typically possess ammunition that is compatible with their firearms so that they can utilize their firearms in order to protect their valuable possessions, including drugs and drug proceeds.  Therefore, I am seeking permission to search the premises of the properties described in Attachments A-1 through A-3 in all areas where firearms or ammunition could be stored.

52.     Individuals involved in the distribution of drugs often make, or possess, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their trafficking activities, use, possession, or any other activities surrounding trafficking activities, and that such items often identify co-conspirators in these trafficking activities.

53.     It has been my experience that when suspects use cellular telephones to communicate with co-conspirators, cooperating individuals, or undercover agents to set up drug deals, records relating to these activities will be found stored in the cellular telephone.

54.     Based on my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms belonging to children, other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized.  This warrant therefore seeks permission to search the entire premises of the residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.

55.    I know that drug traffickers use cellular telephones to communicate with one another, either by voice or text message; and that KENNEY has used a cellular telephone to communicate with CHS-1 in this investigation on multiple occasions.

56.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators with whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including those controlled substances described in this affidavit, as well as the proceeds from such illegal operations.

57.    Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, and stash locations under their control, the items described in Attachment B.  Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

**THIS AREA LEFT INTENTIONALLY BLANK**

### III.    AUTHORIZATION REQUEST

58.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

59.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ William Silvermaster
William Silvermaster
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to me
telephonically on:                        August 28, 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

/s/ J. DOUGLAS HARMAN
Approved as to form by AUSA J. DOUGLAS HARMAN

## <u>ATTACHMENT A-1</u>

### Property to Be Searched

The property to be searched is 1501 West Capitol Avenue, #105, West Sacramento, California, further described as a single-story motel on West Capitol Avenue, beige in color, with white trim on the windows, room #105 has a white door with the number "105" in white on a blue plaque on the right-hand side of the door.



## <u>ATTACHMENT A-2</u>

**Property to Be Searched**

    The property to be searched is 1501 West Capitol Avenue, #106, West Sacramento, California, further described as a single-story motel on West Capitol Avenue, beige in color, with white trim on the windows, room #106 has a white door with the number "106" in white on a blue plaque on the right-hand side of the door.



## ATTACHMENT A-3

### Property to Be Searched

The property to be searched is 1501 West Capitol Avenue, #107, West Sacramento, California, further described as a single-story motel on West Capitol Avenue, beige in color, with white trim on the windows, room #107 has a white door with the number "107" in black on the right-hand side of the door.



<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by the listed targets:

- Title 21 U.S.C. §§ 846 and 841(a)(1) – Conspiracy to distribute and possess with intent to distribute fentanyl and methamphetamine

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including fentanyl, methamphetamine, or items frequently used to distribute fentanyl and methamphetamine, or items containing residue from the distribution of fentanyl and methamphetamine; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;
2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase methamphetamine and fentanyl;
3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;
4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in the distribution of controlled substances and/or a conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 846;
5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;
6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;
7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;
8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| 1501 West Capitol Avenue, #105, West Sacramento, CA; 1501 West Capitol Avenue, #106, West Sacramento, CA; 1501 West Capitol Avenue, #107, West Sacramento, CA ) ) ) ) ) | Case No.     2:25-sw-0728 AC |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENTS A-1, A-2, and A-3, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ September 11, 2025 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    August 28, 2025 @ 9:13 a.m.

City and state:    Sacramento, California

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
                Signature of Judge                                                    Date

## <u>ATTACHMENT A-1</u>

**Property to Be Searched**

The property to be searched is 1501 West Capitol Avenue, #105, West Sacramento, California, further described as a single-story motel on West Capitol Avenue, beige in color, with white trim on the windows, room #105 has a white door with the number "105" in white on a blue plaque on the right-hand side of the door.



## <u>ATTACHMENT A-2</u>

### Property to Be Searched

The property to be searched is 1501 West Capitol Avenue, #106, West Sacramento, California, further described as a single-story motel on West Capitol Avenue, beige in color, with white trim on the windows, room #106 has a white door with the number "106" in white on a blue plaque on the right-hand side of the door.



## ATTACHMENT A-3

### Property to Be Searched

The property to be searched is 1501 West Capitol Avenue, #107, West Sacramento, California, further described as a single-story motel on West Capitol Avenue, beige in color, with white trim on the windows, room #107 has a white door with the number "107" in black on the right-hand side of the door.



## ATTACHMENT B

### Particular Things to be Seized

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by the listed targets:

- Title 21 U.S.C. §§ 846 and 841(a)(1) – Conspiracy to distribute and possess with intent to distribute fentanyl and methamphetamine

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including fentanyl, methamphetamine, or items frequently used to distribute fentanyl and methamphetamine, or items containing residue from the distribution of fentanyl and methamphetamine; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;
2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase methamphetamine and fentanyl;
3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;
4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in the distribution of controlled substances and/or a conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 846;
5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;
6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;
7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;
8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.